## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| SUSAN KENDRICK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket no. 2:19-cv-00028-GZS |
| | ) | |
| MAINE MEDICAL CENTER and | ) | |
| MAINEHEALTH, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON PENDING CROSS-MOTIONS

Before the Court are two Cross-Motions:  (1) the Motion for Summary Judgment by Defendants Maine Medical Center and MaineHealth (ECF No. 79); and (2) the Motion for Partial Summary Judgment by Plaintiff Susan Kendrick (ECF No. 83).  Having reviewed the Motions and the related submissions filed by the parties (ECF Nos. 72–78, 80–82, 84–85, 91–95 & 100–106), the Court DENIES both Motions.

## I.    STANDARD OF REVIEW

Generally, a party is entitled to summary judgment if, on the record before the Court, it appears "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine dispute is 'one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party.'"  Flaherty v. Entergy Nuclear Operations, Inc., 946 F.3d 41, 53 (1st Cir. 2019) (quoting Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).  "A fact is 'material' if 'its existence or nonexistence has the potential to change the outcome of the suit.'"  Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011) (quoting Borges ex rel.

S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010)).  The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

Once the moving party has made this preliminary showing, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue."  Triangle Trading Co. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (internal quotation marks and ellipsis omitted); see also Fed. R. Civ. P. 56(e).  "Mere allegations, or conjecture unsupported in the record, are insufficient." Barros-Villahermosa v. United States, 642 F.3d 56, 58 (1st Cir. 2011) (quoting Rivera-Marcano v. Normeat Royal Dane Quality A/S, 998 F.2d 34, 37 (1st Cir. 1993)); see also Wilson v. Moulison N. Corp., 639 F.3d 1, 6 (1st Cir. 2011) ("A properly supported summary judgment motion cannot be defeated by conclusory allegations, improbable inferences, periphrastic circumlocutions, or rank speculation.").  "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment for the moving party."  In re Ralar Distribs., Inc., 4 F.3d 62, 67 (1st Cir. 1993). "However, summary judgment is improper when the record is sufficiently open-ended to permit a rational factfinder to resolve a material factual dispute in favor of either side." Morales-Melecio v. United States (Dep't of Health and Hum. Servs.), 890 F.3d 361, 368 (1st Cir. 2018) (internal quotation marks omitted).

District of Maine Local Rule 56 prescribes a detailed process by which the parties are to place before the Court the "material facts . . . as to which the moving party contends there is no genuine issue . . . ."  D. Me. Loc. R. 56(b).  This local rule further requires each statement of material fact to be "followed by a citation to the specific page or paragraph of identified record

material supporting the assertion." D. Me. Loc. R. 56(f). A party opposing a motion for summary judgment must then file an opposing statement in which it admits, denies, or qualifies the moving party's statements, with citations to supporting evidence, and in which it may set forth additional facts, again with citation to supporting evidence. D. Me. Loc. R. 56(c). Ultimately, in constructing the narrative of undisputed facts for purposes of summary judgment, the Court deems any statement with a supporting record citation admitted but "may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment." Id.

The existence of cross-motions for summary judgment does not change the standard for construing the undisputed facts. Rather, the Court is required to "view each motion separately and draw all reasonable inferences in favor of the respective non-moving party." Roman Cath. Bishop of Springfield v. City of Springfield, 724 F.3d 78, 89 (1st Cir. 2013). In accordance with these standards, the Court constructs the undisputed material facts from the record in the following section.

## II.    BACKGROUND[1]

Defendant Maine Medical Center ("MMC") is a hospital located in in Portland, Maine. Until January 1, 2019, MMC was a separate subsidiary corporation of Defendant MaineHealth. (Stip. SMF (ECF No. 85-2), PageID # 2361.) On January 1, 2019, MMC merged into MaineHealth.[2] (Id.)

---

[1] The Court notes that both sides have asked the Court to strike many of their opponent's statements of material fact. See, e.g., Def. Response SMF (ECF No. 91-2), PageID #s 2739–44; Pl. Response SMF (ECF No. 95), PageID #s 3154, 3180, 3183; Def. Reply SMF (ECF No. 100-1), PageID #s 3347, 3366, 3406. The Court finds it unnecessary to address each of these requests individually. Instead, the Court has reviewed all of the cited exhibits and has disregarded any statement of fact that is not properly supported by the record currently before the Court, as it is obliged to do. See D. Me. Loc. R. 56(f).

[2] For purposes of this order, the Court generally refers to MMC and MaineHealth collectively as "MaineHealth."

## A.  MaineHealth's Anti-Discrimination Policies

MaineHealth maintains an Equal Employment Opportunity Policy ("EEO Policy"), which explains that MaineHealth prohibits discrimination in all aspects of employment based on protected classes and that employees should report discrimination of any kind.  (Stip. SMF, PageID # 2361–62.)  The EEO Policy further prohibits any retaliation against employees for complaints of discrimination.  (Id., PageID # 2362.)

MaineHealth also has a Policy on the Americans with Disabilities Act ("ADA Policy"), which describes MaineHealth's process for assisting employees who need an accommodation because of a disability.  (Id.)  The ADA Policy provides:

> If Maine Medical Center is notified that a qualified individual with a disability requests a reasonable accommodation to participate in the application process, perform the essential functions of a job, or enjoy equal benefits and privileges of employment, the organization will engage the qualified individual with a disability in the interactive process.

(Id.)  The ADA Policy further provides that MMC will not tolerate any form of retaliation against an employee who makes a request for a disability accommodation or complains of discrimination based on a disability.  (Id.)

## B.  The Clinical Nurse II Position

Plaintiff Susan Kendrick worked as a Clinical Nurse II in MMC's neonatal intensive care unit ("NICU") from 2009 through December 2017.  (Stip. SMF, PageID # 2363.)  A Clinical Nurse II is a bedside nurse in the NICU, and, in this role, Kendrick was ordinarily assigned to care for two neonates.  (Pl. Response SMF (ECF No. 95), PageID # 3147.)  The MMC job description for Clinical Nurse II included the following essential functions: (1) "demonstrat[ing] the required knowledge and technical skills to care for most patient populations on the unit," (2) "demonstrat[ing] the development of a caring practice," and (3) "provid[ing] ongoing patient and

family education to prepare the patient and family to care for their own needs appropriate to their health status."  (Stip. SMF, PageID # 2364.)

As a Clinical Nurse II, Kendrick would typically start the day with a one-on-one report with the nurse who was leaving at the end of his or her shift, and, depending on the needs of the neonates, she would monitor feedings, medications, or other intravenous medications every hour, checking IV injection sites and insertion sites for arterial or central lines.  (Id., PageID #s 2363–64.)  Kendrick also attended physician rounds and implemented changes to the neonates' care plans from physician orders, and she would potentially need to leave the unit to accompany her patients for testing, MRI scans, or laboratory work.  (Id., PageID # 2364.)  However, due to the fragility of the NICU patient population, there was ultimately no typical day for Kendrick and her fellow NICU nurses.  (Pl. Response SMF, PageID # 3151.)

As relevant here, Kendrick's performance evaluations for both 2016 and 2017 rated her as "successfully achieves" or "exceeds expectations" on all essential functions of the Clinical Nurse II position.  (Def. Reply SMF (ECF No. 100-1), PageID #s 3356–57.)

### C.  Kendrick's Fragrance Reactions

On March 16, 2016, Kendrick experienced her first "fragrance reaction" while at work in the NICU.  (Stip. SMF, PageID # 2364.)  Kendrick's pulmonologist has since diagnosed her with a "neurogenic cough," a condition in which certain stimuli, such as fragrances, trigger nerves in a person's throat that cause a person to start coughing.[3]  (Id.)  Kendrick describes the experience as follows:

---

[3] Kendrick testified that her physicians have not identified any specific chemical triggers for these reactions, and her own understanding was that identifying such triggers would be "impossible because there are so many chemicals." Pl. Response SMF, PageID # 3172.  Kendrick herself wears scented essential oils, but testified that they do not trigger reactions because they were "pure" and "natural," rather than "made out of chemicals."  Id., PageID #s 3176–77. Kendrick also reported previously that she reacts to "'grocery or pharmacy type' fragrance[s]" but not to "more expensive perfumes."  See Kendrick Dep. Ex. 2 (ECF No. 73-3), PageID # 901.

> I feel it in the back of my throat first, and then I know something's happening. And it causes me to start coughing and protractive coughing. I just cough and cough and cough, and the coughing irritates my throat and makes it really sore. I get a pain in my chest that goes directly down my sternum and seems to follow the lines of my bronchus. I get a headache.

(Id., PageID #s 2364–65.)[4]  During these reactions, Kendrick can experience shortness of breath, loss of bladder control, light-headedness, chest pain, and difficulty talking.  (Pl. Response SMF, PageID # 3154.)  However, the symptoms Kendrick experiences during a reaction are temporary and cause her no lasting harm.  (Def. Response SMF (ECF No. 91-2), PageID # 2742.)

At the onset of her reactions, Kendrick feels an irritation before she can smell the offending fragrance.  (Stip. SMF, PageID # 2365.)  When Kendrick starts coughing due to a fragrance, she has to leave the area where the fragrance is present or else her coughing will not resolve.  (Def. Response SMF, PageID # 2740.)  In some cases, Kendrick has been able to quickly finish her current task before leaving the area.   (See, e.g., Def. Reply SMF, PageID #s 3364–65.)   Her reactions, at the extremes, have lasted between 15 minutes and 22 hours (see Pl. Response SMF, PageID #s 3156–57 & 3160),[5] and they have at times required her to leave work altogether or visit the emergency health department (see, e.g., id., PageID #s 3155 & 3158.).   Kendrick can neither eat nor sleep during a reaction.  (Def. Response SMF, PageID #s 2741.)

### D.  MMC: 2016–18

#### 1.  Kendrick's Reactions

Kendrick experienced five more reactions in the NICU between March 19 and June 18, 2016, each triggered by encounters with fragrance-wearing visitors.  (Stip. SMF, PageID #s 2365–

---

[4] The Court has received and reviewed two videos demonstrating Kendrick's reactions.  See Kendrick Video (ECF No. 74-39); Kendrick Aff. Ex. B (ECF No. 95-21).

[5] Kendrick was prescribed Spiriva Respimat in June 2016.  Def. Response SMF, PageID # 2736.  She claims that this medication, in combination with Tessalon Perles (prescribed in May 2018) and other techniques, has decreased the duration and severity of her reactions, such that these reactions are limited to under an hour.  Id., PageID #s 2736–37.

66.)   Kendrick also reported that in this period she experienced additional reactions at a supermarket and the home of a friend.  (Pl. Response SMF, PageID # 3160; Kendrick Dep. (ECF No. 73-3), PageID #s 760 & 783.)  Between June 18, 2016, and July 19, 2016, Kendrick took an extended medical leave, during which her doctors sought to determine if her reactions could be abated.  (Def. Reply SMF, PageID #s 3359–60.)  Despite these efforts, Kendrick experienced another reaction while working on August 25, 2016, again through contact with visitors, although these visitors denied wearing any fragrance.  (Stip. SMF, PageID # 2366.)

Kendrick's next reported reaction in the NICU was not until September 8, 2017, which was followed in close succession by two further reactions.[6]  (Id.)  Kendrick also experienced further workplace reactions in October, November, and December 2017.  (Id., PageID #s 2366–67.)

## 2.   Initial Fragrance-Free Efforts at MMC

By 2016, MaineHealth included in its Employee Handbook a Professional Appearance Policy for employees, which stated in relevant part:

> Maine Medical Center is a Fragrance-Free environment (perfumes, colognes, lotions, or any similar, scented product) of any kind are not permitted.  In addition, tobacco products on clothing should not be noticeable by others.

(Stip. SMF, PageID # 2362.)[7]  In or about 2013, MMC began displaying fragrance-free signage on digital displays located in various areas in the hospital, including entryways, the main entrance

---

[6] Due to an unrelated injury, Kendrick missed a significant amount of work in the intervening period, including a continuous absence between January and April 2017.  Pl. Response SMF, PageID #s 3164–65.

[7] This policy was later updated and moved to the Standards of Conduct Policy for MaineHealth employees on January 1, 2019, now stating:

> MaineHealth cannot guarantee an environment completely free of all fragrances; however, it is committed to taking reasonable steps to minimize the presence of fragrance reported as bothersome or excessive. Employees should refrain from using products with noticeable fragrances such as tobacco, perfumes, colognes, aftershave, or scented lotions immediately before or during work.

Stip. SMF, PageID # 2363.

to MMC, the corridor on the 8th floor of the parking garage that connects to the MMC building, and at the entrance to the then-East Tower ("East Tower"), where the NICU was located.  (Pl. Response SMF, PageID #s 3158–59.)

Between May and June 2016, HR Partner Susan Hodge[8] requested additional signage in the areas where Kendrick most often worked, including the security desk at the entrance of the East Tower and areas within the East Tower, as well as the creation of additional signage in languages known to be spoken at MaineHealth.  (Id., PageID # 3159.)  Also, in May 2016, Marketing Manager Karen Barlow created similar fragrance-free advisories on the backs of parking spot reminder cards that were offered to MMC visitors and patients.  (Id.)

Additionally, Nurse Manager Linda Brady and NICU Nurse Director Sarah Thompson had almost daily conversations with the NICU staff about Kendrick's needs, instructing that any staff member who noticed a fragrance should try to alert the managers or Kendrick to keep her away from the area.  (Id., PageID #s 3162–63.)  Nursing staff who noticed a fragrance would call down to the nurses' station where Kendrick was working to warn her.  (Id., PageID # 3163.)  Brady and others in the NICU also pursued a variety of measures, including speaking with families about wearing fragrance, providing wipes or towelettes for them to attempt to remove fragrance, providing a disposable gown for them to wear, and informing family members to remove fragrances before coming to the unit.  (Id., PageID # 3162; Brady Dep. (ECF No. 76), PageID # 1846–47.)  Further, in September 2016, an evaluation of the NICU's ventilation system

---

[8] The Court notes that, in 2017 and earlier, Hodge received training on the ADA and the Maine Human Rights Act from MaineHealth's legal counsel.  Def. Reply SMF, PageID #s 3422–23; Hodge Dep. (ECF No. 73-8), PageID #s 1224–26.

was performed by an industrial hygienist.  (Pl. Response SMF, PageID # 3161; Davis Dec. Ex. 1 (ECF No. 80-10), PageID # 2025.)[9]

Additionally, throughout 2016 and 2017, a pamphlet entitled "Guidelines for Families Staying with Their Babies" was distributed to NICU patient families, stating as follows:

> Maine Medical Center is a fragrance free environment. Strong smells can cause a severe reaction in these fragile patients as well as staff. This includes all colognes, oils, perfumes and smoke odors. If your environment results in excess odor on your clothing, please change prior to visiting[.] Please help by communicating this to visiting family and friends. If necessary, visitors may be offered personal wipes and asked to remove fragrances etc.

(Def. Reply SMF, PageID #s 3408–09.)   Reinforcing this message, NICU staff also orally explained to patient families that it was important that they not wear scented products into the NICU because it could be detrimental to the health of the babies in the NICU.   (Id., PageID # 3409.)

### 3.  Later Fragrance-Free Efforts and Kendrick's Transfer

In the latter half of September 2017, Kendrick explored a transfer out of the NICU, looking for places to work where she would potentially have "less exposures to perfume."  (Pl. Response SMF, PageID #s 3165–66.)   She applied for a position with the Maine Medical Partners Pediatric Gastroenterology Practice ("MMP"), a MaineHealth outpatient practice.   (Id.)   At that time, however, Kendrick elected not to transfer to MMP.  (Id., PageID # 3166.)

On November 15, 2017, Hodge, Brady, Thompson, ADA Specialist Diane Davis, and Employee Health ADA Case Manager Andrea Korda-Willerson (collectively, the "Group") met with Kendrick to discuss her exposures to fragrance and possible options for protective equipment. (Id., PageID # 3167.)   The Group concluded that "there [were] limitations on what MMC [was]

---

[9] Kendrick acknowledges that this evaluation occurred but maintains it, along with other actions undertaken by MMC to reinforce its fragrance-free environment, was not intended as an accommodation for her alone.  See, e.g., Pl. Response SMF, PageID #s 3161–62.

able to enforce upon the public for the practice of fragrance free." (Id.)  The Group explored N95 masks, but those were rejected, as it was deemed that they would not be effective.  A cartridge mask respirator was also suggested, but "due to [Kendrick's] interface with the public and patients" it was not deemed a viable option.  (Id.)

The Group reaffirmed that if Kendrick encountered a person wearing fragrance, she would report that fact and remain away from the individual.  (Id., PageID #s 3167–68.)  Brady and Thompson agreed to continue to promote a fragrance-free environment, and Hodge agreed to continue reviewing fragrance-free policies.  (Id.)  The Group decided Davis would begin working with Reassignment Specialist Susan Gatti to identify potentially comparable positions for Kendrick.  (Id.)  Group members later met with the security department to discuss measures that they could undertake to assist in limiting visitors from entering the NICU wearing fragrances, including keeping a basket of wipes to remove fragrances at the security post, referring visitors to nearby signage at the post, and reminding them that they should not wear fragrances.  (Id., PageID # 3168.)  At this meeting, it was also discussed whether security could call up to the NICU to warn them if they noticed a visitor wearing fragrance, but this was not implemented.  (Def. Reply SMF, PageID # 3332.)

On December 12, 2017, Senior Vice President of Human Resources Judith West sent a letter to all employees reminding them that MMC was a fragrance-free facility.  (Id., PageID # 3339.)  Kendrick subsequently wrote her own letter to several employees of MaineHealth, including West and members of the Group, summarizing her history of reactions and suggesting several measures she claimed could aid enforcement of a true fragrance-free environment.  (Pl. Response SMF, PageID #s 3168–69.)

In a letter dated December 20, 2017, Korda-Willerson requested information from Kendrick about her medical condition.  (Stip. SMF, PageID # 2367.)  The letter asked, in part:

> Please have a treating healthcare provider with appropriate expertise, familiar with your medical condition address the following questions: . . .
> 2. To the extent medically supported, please provide the names of specific chemicals/ingredients of fragrances that trigger a reaction and an opinion if any level of exposure to fragrance can be tolerated or is safe for your patient.
> 3. Please specify the nature/degree of your patient's workplace/restrictions/limitations related to her medical condition.
> 4. Please indicate what accommodations, if any, would be effective in enabling your patient to overcome any limitations or restrictions and perform the essential functions of her position.

(Davis Dep. Ex. 18 (ECF No. 73-9), PageID # 1436.)

Kendrick provided three responses from her treating physicians.   (Stip. SMF, PageID # 2367;  Pl. Response SMF, PageID # 3171.)   In his response dated January 3, 2018, Kendrick's pulmonologist, Dr. Joel Wirth, indicated that there was no "safe level" of fragrances that he could identify, and that Kendrick needed to be "100%" restricted from fragrance exposure. (Davis Dep. Ex. 18, PageID # 1436.)  He recommended enforcement of a "'no-perfume' policy" as an accommodation for Kendrick.  (Id.)  Likewise, Kendrick indicated on the same form that her "requested accommodation" was a "fragrance free environment as per MMC policy."  (See, e.g., id., PageID # 1435.)

On January 19, 2018, while Kendrick was on an extended leave due to an unrelated injury, Korda-Willerson created a document concerning Kendrick that stated: "Work restrictions: Needs to be in Fragrance-free environment. *Permanent*."  (Stip. SMF, PageID # 2368.) MaineHealth refers to this type of document as a "scrubbed document."   (Id.; Pl. Response SMF, PageID # 3173.)  Upon review of the scrubbed document, Brady wrote to Hodge and Davis stating, "These restrictions are something I can't promise."  (Pl. Response SMF, PageID # 3173.)  On February 9, 2018, Hodge and Davis held a conference call with Kendrick, explaining that, due to

11

the work restrictions in the scrubbed document, she could not be cleared to return to the NICU even after her unrelated injury healed.  (Id., PageID # 3177.)  Hodge and Davis further indicated that they would discuss with the NICU managers whether the department could accommodate her fragrance restrictions, and Kendrick would be placed on paid leave pending the outcome.  (Id.)

MaineHealth eventually decided that Kendrick could not return to her NICU position due to concerns about the safety of both Kendrick and the patient population.  (Id., PageID #s 3177–78; LeRoy Dep. (ECF No. 73-16), PageID #s 1714–15.)  In considering positions to offer Kendrick, MaineHealth focused on jobs that would require Kendrick to spend less than half of her time directly caring for patients, in order to limit the potential for fragrance reactions; ultimately, MaineHealth offered Kendrick reassignment to the MMP position she had previously considered. (Def. Response SMF, PageID # 2749.)  In the NICU, Kendrick's hourly rate of pay had been $45.03, but at MMP it would decrease to $38.89.  (Stip. SMF, PageID # 2368.)  Kendrick initially asked to negotiate her MMP pay rate to be closer to her existing wage, but she was told that she had been offered the maximum rate for the position and thereafter accepted the lower paying position at MMP.  (Pl. Response SMF, PageID #s 3184–85.)  If she had not accepted, she believed she would have become "unemployed and without a pay check."  (Def. Reply SMF, PageID #s 3355–56.)

### E.  Post-Transfer – MMP: 2018–19

Kendrick began working at MMP on March 13, 2018.  (Stip. SMF, PageID # 2368.)  At MMP, Clinical Manager Meagan Oberholtzer and Director of Practice Operations Audra Buschagen made simple printed signs to alert patients and families to refrain from wearing fragrance due to staff and patient sensitivities.  (Pl. Response SMF, PageID # 3185.)  Additionally, Oberholtzer and Buschagen added information to their new-patient letters, advising patients to avoid wearing fragrances.  (Id., PageID #s 3185–86.)

Nevertheless, Kendrick continued to experience fragrance reactions at MMP. (Stip. SMF, PageID # 2368.) Kendrick's first reaction occurred on March 29, 2018, when she entered a patient room where a parent was wearing strong smelling perfume. (Pl. Response SMF, PageID #s 3187–88.) Following that reaction, Oberholtzer reminded staff that if a patient was being "roomed" and there was a noticeable scent, they should alert one of the nursing staff. (Id.)

In April 2018, Kendrick twice experienced reactions in the elevator of the building where the MMP practice was located. (Id., PageID # 3188.) On May 3, 2018, Kendrick experienced another reaction upon entering a patient-occupied examination room. (Id.) Then, via a May 17, 2018 email addressed to West, Davis and Hodge, Kendrick requested a transfer back to the NICU and reiterated her request for the following actions to implement the fragrance-free accommodation:

1. Insert pamphlets in admission packets;
2. Make public service announcements;
3. Improve visibility of signage at every entrance;
4. Use the Security Department to enforce the Fragrance-Free Policy using one or more of the following methods:
   a. Purchase an odor meter and have security personnel use it to detect visitors who are wearing heavy fragrances;
   b. Directing the person to remove fragrance by washing and/or changing clothes;
   c. Having the person don a Tyvek suit to mask the fragrance, charging the person a small fee for the suit;
   d. Asking the person to leave if they cannot or will not comply;
   e. Disciplinary action for repeat offenders.

(Davis Dep. Ex. 24 (ECF No. 73-9), PageID # 1443.)

On June 14, 2018, Kendrick experienced two reactions on the same day, at a staff meeting and in the mailroom. (Stip. SMF, PageID # 2369.) On July 6, 2018, Kendrick met with Hodge and Davis to explore what reasonable accommodations, if any, MaineHealth could provide to mitigate her ongoing fragrance reactions. At this time, although it was still deemed that N95 masks

would not present a barrier to fragrance, MaineHealth offered Kendrick to try an activated charcoal mask, which they had identified as a possible solution.  (Pl. Response SMF, PageID # 3191.) Kendrick renewed her request to return to the NICU, and they discussed ongoing efforts to limit family members and visitors from entering with fragrance.  Hodge advised, however, that there were limitations on what MMC could do to intervene with the general public.  (Id., PageID #s 3191–92.)

Kendrick experienced another reaction in August 2018, from a fragrance lingering in a MMP bathroom.  (Stip. SMF, PageID # 2369.)  In September 2018, she experienced a reaction in the stairwell of the MMP building.  (Pl. Response SMF, PageID # 3192.)  That same day, she met with Hodge and Integrated Disability, Absence and Accommodation Manager Thomas LeRoy to discuss two types of activated charcoal masks, including an N95-style mask (the potential of which had apparently been reconsidered).  (Id.)

Kendrick experienced three further reactions between October and December 2018, one of which was from a fragrance lingering in the vestibule of the building's employee entrance.  (Id., PageID #s 3192–93.)  She experienced another reaction in January 2019, while attending a skills fair event.  (Id., PageID # 3193.)

In February 2019, Kendrick met with Hodge, LeRoy, and Oberholtzer to again review potential accommodations.  In this meeting, LeRoy brought two additional masks for Kendrick to try.  (Id., PageID #s 3193–94.)   In March 2019, Kendrick experienced a reaction upon encountering a fragrance-wearing interpreter in an examination room, despite wearing an N95 mask. (Stip. SMF, PageID # 2370.) In April 2019, Kendrick walked from MMP to the East Tower for an N95 mask fit test.  While walking to the East Tower, Kendrick was wearing a P95 mask (also recommended by LeRoy).   Inside the elevator of the building's parking garage, she

experienced a fragrance reaction, despite this mask. (Id., PageID #s 2370–71.) When Kendrick was fitted that day for the N95 mask, she was unable to pass the testing. (Pl. Response SMF, PageID # 3194.)

Kendrick experienced further reactions in April and July 2019. (Stip. SMF, PageID # 2371.) She took an extended leave from September 18 through December 31, 2019, at which point she retired. (Pl. Response SMF, PageID #s 3209–10.)

### F.  Kendrick's Attempts to Transfer to Another Position

After Kendrick's March 2018 reassignment, she submitted numerous applications to open positions within MaineHealth. (Def. Response SMF, PageID # 2752.) On December 27, 2018, Kendrick emailed Hodge to ask why she was not being considered for these positions.[10] (Id.) Hodge responded that Kendrick had applied for positions within the hospital environment, but MaineHealth could not presently guarantee a fragrance-free environment there. She added that their goal was to continue exploring the efficacy of masks before considering future employment options, including those within the hospital environment. (Pl. Response SMF, PageID #s 3200–01.)

On December 28, 2018, upon Hodge's request, MaineHealth's Talent Acquisition Department instituted a "pause" in its computer system on Kendrick's applications.[11] (Id.; Def. Response SMF, PageID # 2752.) Because of the "pause," Talent Acquisition did not forward Kendrick's applications for at least two positions to their hiring managers for consideration. (Id.,

---

[10] Specifically, Kendrick asked, "Can you explain why I am not being considered for any of the positions I have applied for?" 12/27/18 Email (ECF No. 82-3), PageID # 2249. She also noted that she had previously worked in one of the labs where she applied, but nonetheless had now been told that she did not meet the qualifications for that position. Id.

[11] Talent Acquisition is a MaineHealth department where all job applications go after applicants submit them. Def. Response SMF, PageID # 2752. After Talent Acquisition decides which applications to forward to the relevant hiring managers, the hiring managers consider the applications and decide who to interview. Id., PageID # 2753.

PageID #s 2756–57.)   Kendrick possessed the minimum qualifications necessary for these positions.  (Id., PageID # 2757.)  Kendrick did not learn about the pause on her applications until September 2020, during the discovery process.[12]  (Id., PageID # 2758.)

### G. Kendrick's Post-Retirement Work[13]

Since her retirement from MMP at the end of 2019, Kendrick has sought and obtained employment, including providing in-home care through an agency and, more recently, doing COVID-19 testing.  (Def. Response SMF, PageID #s 2759–61; Kendrick Aff. (ECF No. 84-6), PageID # 2287.)  In December 2020, Kendrick was hired as a per diem RN Covid Testing Clinician by Mid Coast Hospital.[14]  (Def. Response SMF, PageID #s 2761–62; Kendrick Aff., PageID # 2288.)

---

[12] In the wake of this revelation, Kendrick now asserts by affidavit that she would have applied for nine or more positions with MaineHealth but for the pause. Kendrick Aff. (ECF No. 84-6), PageID # 2288; see also Pl. Response (ECF No. 94), PageID # 3133.  Defendants genuinely dispute this assertion, along with Kendrick's affidavit generally. See Def. Response (ECF No. 91-1), PageID # 2715; Def. Reply SMF, PageID # 3422.

[13] The Court acknowledges that Defendants have strenuously objected to Kendrick's Affidavit (ECF No. 84-6), which is the primary source for Kendrick's post-retirement updates.  See Def. Response SMF, PageID #s 2759–63; Def. Reply SMF, PageID #s 3421–22.  To the extent that Defendants argue Kendrick's affidavit should be deemed a "sham affidavit," the Court disagrees.  As a factual matter, the Court notes that Kendrick's deposition (ECF No. 73-3) was taken on August 13, 2019. Obviously, the basic facts related to her work and reactions after that date were not a topic of questioning.  See, e.g., Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4–5 (1st Cir. 1994) (Under the sham affidavit rule, "[w]hen an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory.").  To the extent that Defendants' objection is based on an asserted Rule 26(e) violation, the Court has reviewed Plaintiff's Response (ECF Nos. 103 & 106), along with evidence of her supplemental production (ECF Nos. 103-7 & 103-8) and communication between counsel (ECF No. 103-4), and finds the claimed violation harmless in the context of these cross-motions for summary judgment.  See Zampierollo-Rheinfeldt v. Ingersoll-Rand De P.R., Inc., ___ F.3d ___, 2021 U.S. App. LEXIS 16146, at *12 (1st Cir. May 28, 2021) ("[I]n the absence of harm to a party, a district court may not invoke the severe exclusionary penalty provided for by Rule 37(c)(1).") (quotation marks omitted).  Moreover, Defendants' asserted denial was not accompanied by any citation that evinces a genuine dispute on these issues, nor did Defendants request relief in accordance with Federal Rules of Civil Procedure 37(c)(1) or 56(d).  See Sebunya v. Holder, 293 F.R.D. 36, 39 (D. Me. 2013) ("To the extent that Plaintiff has additionally argued that he was prejudiced by Defendant's delayed supplemental disclosures on this topic, any issues related to Defendant's compliance with Federal Rule of Civil Procedure 26(e) are properly resolved by way of a motion under Federal Rule of Civil Procedure 37(c), a motion that is not presently before the Court."); In re PHC, Inc. S'holder Litig., 762 F.3d 138, 143–44 (1st Cir. 2014) (describing the required showing for relief under Fed. R. Civ. P. 56(d)).

[14] As the result of a merger of MaineHealth and Mid Coast Hospital in 2019, Kendrick actually resumed employment with MaineHealth when she was hired for this position at Mid Coast Hospital.  Def. Response SMF, PageID # 2762.  Ironically, this provided an alternative avenue for Defendants to learn about this aspect of Kendrick's post-retirement work.

According to Kendrick, she has continued to experience fragrance reactions, although she has not reported any reactions in connection with her post-retirement work.  (Kendrick Aff., PageID #s 2286–87.)

## H.  Procedural History

In May 2018—roughly six weeks after her transfer to MMP—Kendrick filed a complaint with the Maine Human Rights Commission ("MHRC") and EEOC, asserting that she had been discriminated against on the basis of disability in the period between January 30 and February 28, 2018.  She also asserted that she had been retaliated against for seeking an accommodation. (Administrative Complaint (ECF No. 95-20), PageID #s 3280–87.)  In November 2018, Kendrick received right-to-sue letters from both agencies.  (Letters (ECF No. 95-20), PageID #s 3288–89.) On January 11, 2019, Kendrick filed this action.  (Compl. (ECF No. 1).)

## III.   DISCUSSION

In her Complaint, Plaintiff asserts claims of disability discrimination, failure to accommodate, and retaliation, each in violation of the Maine Human Rights Act ("MHRA"), 5 M.R.S.A. §§ 4551 *et seq.* (Counts I–III); the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.* (Counts IV–VI); and Section 504 of the Rehabilitation Act, 29 U.S.C. §§ 701 *et seq.* (Counts VII–IX).   (Compl., PageID #s 18–20.)   Through their Motion (ECF No. 79), Defendants seek summary judgment on all of these claims.  While opposing Defendants' request for summary judgment, Plaintiff also seeks partial summary judgment on three issues:  (1) she is an individual with a disability under the three just-cited statutes; (2) "Defendants violated the MHRA when they instituted the 'pause' on [her] job applications;" and (3) "Defendants cannot justify the 'pause' based on the MHRA safety defense."  (Pl. Mot. (ECF No. 83), PageID # 2264.)

While each side's pending motion raises issues that merit individual consideration, the Court first addresses a threshold issue raised by both Motions:  Does Plaintiff's condition meet the applicable statutory definition of disability?

**A.  Disability**

Via their Motion for Summary Judgment, Defendants assert that Plaintiff "cannot show she has a disability as defined under the ADA, Rehabilitation Act or the [MHRA]."  (Def. Mot. (ECF No. 85-1), PageID #s 2346–47.)  Plaintiff, on the other hand, affirmatively seeks summary judgment on this issue, arguing that "there is no genuine dispute that Ms. Kendrick is an individual with a disability under the ADA, Rehab Act, and MHRA because (1) her neurogenic cough substantially limits one or more major life activities; (2) she was 'regarded as' disabled; and (3) her neurogenic cough significantly impairs physical health." (Pl. Mot., PageID # 2253.)

A showing of disability is generally a requisite first step in establishing a disability discrimination or a failure to accommodate claim.  See Sepúlveda-Vargas v. Caribbean Rests., LLC, 888 F.3d 549, 553 (1st Cir. 2018) (failure to accommodate); Roman-Oliveras v. Puerto Rico Elec. Power Auth., 655 F.3d 43, 48 (1st Cir. 2011) (disability discrimination).  The ADA[15] defines "disability," with respect to an individual, as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."   42 U.S.C. § 12102(1).  "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning,

---

[15] While the Court focuses its discussion on the statutory language of the ADA, the analysis applies with equal force to Plaintiff's claims under the Rehabilitation Act and the MHRA.  See, e.g., Burnett v. Ocean Props., Ltd., 987 F.3d 57, 64 (1st Cir. 2021) ("Because the ADA and its Maine equivalent, the MHRA, have similar language, we discuss the statutes together."); LaFlamme v. Rumford Hosp., 2:13-cv-00460-JDL, 2015 U.S. Dist. LEXIS 67962, at *43 ((D. Me. May 23, 2015)), adopted by 2015 U.S. Dist. LEXIS 88953 (D. Me. July 9, 2015) ("Relief available under the Rehabilitation Act is coextensive with relief under the ADA, and the analysis governing each statute is the same except that the Rehabilitation Act includes as an additional element the receipt of federal funds.") (cleaned up).

reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). Such activities also include "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C. § 12102(2)(B). "[A] determination as to whether [the] 'substantially limits' requirement has been satisfied calls for a comparison between the plaintiff's limitations and those of the majority of people in the general population." Mancini v. City of Providence, 909 F.3d 32, 42 (1st Cir. 2018); see also 29 C.F.R. § 1630.2(j)(1)(ii) ("An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population.").

Viewing the record in the light most favorable to Plaintiff, the Court readily finds sufficient trialworthy evidence that Plaintiff's neurogenic cough is an impairment that substantially limits one or more major life activities. Plaintiff specifically argues that she is substantially limited in multiple major life activities, including "speaking, communicating, interacting with others, neurologic functioning, sleeping, eating, and working."[16]   (Pl. Mot., PageID # 2253.)   Her evidence would allow a factfinder to conclude that her neurogenic cough substantially limits her ability to perform one or more of these activities as compared to most people. While Defendants urge the Court to take a narrow view of Plaintiff's impairment, claiming it only impairs her ability to work in her specialized workplace, this view is genuinely disputed. (See Def. Mot. (ECF No.

_____

[16] To the extent that Defendants object that Plaintiff expanded her list of impacted major life activities without first amending her complaint, this argument is without merit. See Def. Response. (ECF No. 91-1), PageID # 2722. At summary judgment, the Court is "not constrained to the facts specifically alleged in the complaint—facts which generally must give the defendant only 'fair notice' of what the plaintiff's claim is and the grounds upon which it rests." Zampierollo-Rheinfeldt v. Ingersoll-Rand de P.R., Inc., ___ F.3d ___, 2021 U.S. App. LEXIS 16146, at *31 (1st Cir. May 28, 2021). Here, by pleading substantial limitations in the area of breathing, Defendants were on fair notice that Plaintiff might claim limitations of other major life activities that are contingent on breathing, which would include speaking, communicating, interacting with others, neurologic functioning, sleeping, eating, and working. See Compl., PageID # 15.

85-1), PageID #s 2347–48.)   As a result, the Court concludes Defendants are not entitled to summary judgment on the issue of Plaintiff's disability.

Beyond the factually disputed issues of whether Kendrick's fragrance-triggered neurogenic cough qualifies under the statutory definition as an actual disability, Plaintiff asserts that there is no genuine dispute that Defendants regarded her as disabled.   Under the ADA, as amended, "if [an] individual establishes that . . . she has been subjected to an action prohibited . . .  because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity," she may qualify for protection from discrimination as a person "regarded as" being disabled.   42 U.S.C. § 12102(3)(A).   Defendants counter that their responses to Kendrick's requests for accommodation and physician-ordered restrictions were required by law and should not serve as basis for a "regarded as" claim.   (See Def. Response (ECF No. 91-1), PageID #s 2725–26.)   Viewing the record presented in the light most favorable to Defendants, the Court concludes that this issue of whether Plaintiff was "regarded as" disabled is trialworthy.   As a result, the Court concludes that Plaintiff is not entitled to partial summary judgment on this issue.[17]

---

[17] The Court notes that this "regarded as" theory would not support Plaintiff's failure to accommodate claim under the federal statutes.   See 42 U.S.C. § 12201(h) (stating that an employer "need not provide a reasonable accommodation" to a "regarded as" plaintiff); 29 U.S.C. § 794(d) (applying, *inter alia*, 42 U.S.C. § 12201 to determine whether Rehabilitation Act has been violated); see also Mekonnen v. OTG Mgmt., LLC, 394 F. Supp. 3d 134, 154 (D. Mass. 2019) (noting that, under the ADA, plaintiff "cannot bring a failure to accommodate claim under the theory that she was 'regarded as disabled'"), aff'd, No. 19-1846, 2021 U.S. App. LEXIS 8798 (1st Cir. Mar. 23, 2021); Daly v. Westchester Cty. Bd. of Legislators, No. 7:19-cv-04642-PMH, 2021 U.S. Dist. LEXIS 12336, at *24 (S.D.N.Y. Jan. 22, 2021) ("[U]nder the Rehabilitation Act . . . a failure to accommodate claim can proceed only on a showing that Plaintiff is so disabled.").   Given this limitation, the Court notes that a partial summary judgment on this particular issue would have no impact on Plaintiff's federal failure to accommodate claims (Counts V & VII).   It is not apparent that Plaintiff's failure to accommodate claim under the MHRA is similarly restricted.   See generally 5 M.R.S.A. §§ 4553-A(1)(D) & 4554(4) ("The definition of 'physical or mental disability' in [the MHRA] is intended to be interpreted broadly to create greater coverage than under the [ADA.]").

**B. Remaining Issues Raised by Defendants' Motion for Summary Judgment**

Having concluded that the issue of Plaintiff's disability or lack thereof can only be resolved at trial, the Court next considers Defendants' other asserted bases for summary judgment. In doing so, the Court deploys the McDonnell Douglas burden-shifting framework.[18]  This framework requires that Plaintiff first present a prima facie case to support her claim of discrimination or retaliation.  If the Court determines that the summary judgment record establishes a prima facie case, the burden shifts to the Defendants "to identify a legitimate reason for the adverse employment action." Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 350 (1st Cir. 2018).  In the third and final step, "the burden reverts to the plaintiff to show that the proffered reason was not the real reason for the adverse employment action but, rather, was a pretext for retaliation" or discrimination. Id.

The Court first considers whether the record, viewed in the light most favorable to Plaintiff, establishes a prima facie case as to her claims of disability discrimination, failure to accommodate, and retaliation.

**1. Prima Facie Case of Disability Discrimination**

To make a prima facie case of disability discrimination under the ADA, a plaintiff must put forward evidence "showing that (1) [she] was disabled within the meaning of the Act; (2) [she] could perform the essential functions of [her] job, with or without reasonable accommodation[;] and (3) the employer took adverse action against [her], in whole or in part, because of [her]

---

[18] Plaintiff asserts that this case involves direct evidence of discrimination and the Court need not apply McDonnell Douglas. See Pl. Response, PageID # 3130.  On the disputed record presented, the Court concludes that Defendants' summary judgment arguments are best reviewed using the McDonnell Douglas framework. See Flaherty v. Entergy Nuclear Operations, Inc., 946 F.3d 41, 53 (1st Cir. 2019) ("Where, as here, the plaintiff does not have direct evidence of discriminatory animus, we generally apply the burden-shifting framework outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973).")  However, the Court notes that analyzing Kendrick's claims under the direct method would yield the same conclusion. See Hostettler v. Coll. of Wooster, 895 F.3d 844, 853 (6th Cir. 2018) (explaining the direct method and applying it "when an employer rescinds a reasonable accommodation").

disability." Roman-Oliveras, 655 F.3d at 48.  For reasons already discussed, the Court concludes

that the issue of Plaintiff's disability is trialworthy.  However, Defendants also target the second

element, arguing that Plaintiff cannot muster evidence that she was capable of performing the

essential functions of her NICU position, or the other hospital positions she applied for.[19]  (See

Def. Mot., PageID #s 2348–52; Def. Response, PageID #s 2726–28.)

    "The ADA defines a 'qualified individual' as 'an individual who, with or without

reasonable accommodation, can perform the essential functions of the employment position' in

question." Thompson v. Gold Medal Bakery, Inc., 989 F.3d 135, 141–42 (1st Cir. 2021) (quoting

42 U.S.C. § 12111(8)).  "[T]he complex question of what constitutes an essential job function

involves fact-sensitive considerations and must be determined on a case-by-case basis."

Sepúlveda-Vargas, 888 F.3d at 553 (quoting Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11,

25 (1st Cir. 2002)).

    At the outset, Plaintiff proffers that the satisfactory performance evaluations she received

in 2016 and 2017 suffice to satisfy the "qualified individual" prong of her prima facie case.  (See

Pl. Response, PageID # 3118.)   On the record presented, the Court agrees that Kendrick's

performance evaluations are evidence from which a reasonable factfinder might conclude that she

was capable of performing the essential functions of her NICU position even after she began

suffering from fragrance-induced neurogenic cough episodes.[20]   In fact, the First Circuit has

---

[19] Notably, Defendants do not contest the third adverse action prong, and the record readily supports a prima facie case that Kendrick was removed from her NICU position at least in part because of her asserted disability and that she was not considered for at least two "hospital setting" positions due to her asserted disability. See Def. Response SMF, PageID #s 2748–49 & 2756–57.

[20] To the extent that the Defendants contend that these performance evaluations did not encompass the time periods when Plaintiff's performance was impacted by her fragrance reactions, this contention does not preclude Plaintiff's reliance on the performance evaluations, as written, to satisfy this element of her prima facie case.  See Def. Reply SMF, PageID # 3356–57; Brady Dep. (ECF No. 76), PageID # 1838 (noting review did not encompass times when Plaintiff was "on a leave of absence").

previously found that evidence that an employer "pronounced itself fully satisfied with [an employee]'s level of performance even while she suffered from her [disability]" can create a trialworthy issue as to whether the employee is a qualified individual. <u>Calero-Cerezo v. U.S. Dep't of Just.</u>, 355 F.3d 6, 23 (1st Cir. 2004).

However, the Court also acknowledges multiple genuine factual disputes as to what were the essential functions of the NICU position.[21]  For example, the record reflects disagreement over the necessity of Kendrick delivering an in-person report when handing off care of a patient, as well as her capacity to effectively perform this task during a reaction.  (<u>See, e.g.</u>, Smith Dep. (ECF No. 93-10), PageID #s 2951, 2954 & 2964 (handoffs can be nonverbal and, in any event, Plaintiff could give brief answers to questions); Kendrick Dep. (ECF No. 73-3), PageID #s 763–64 (expressing skepticism of reliance on nonverbal handoffs); Wadman Dep. (ECF No. 73-7), PageID # 1199 (noting that interruptions during handoffs should be minimized).)  The record also reflects factual disagreement on the degree and impact of the NICU staffing challenges caused by Plaintiff's unscheduled absences.  (<u>See</u> Def. Reply SMF, PageID #s 3396–97; <u>see also</u> Smith Dep. (ECF No. 93-10), PageID # 2963; Thompson Dep. (ECF No. 73-10), PageID #s 1468–69 (noting staffing concerns).)  Likewise, the degree of the risk Kendrick's condition posed to herself and NICU patients is genuinely disputed on the record before the Court.  (<u>See, e.g.</u>, Thompson Dep. (ECF No. 93-16), PageID # 3092 (acknowledging no "known harm or adverse effects suffered by patients as a result of . . . Kendrick's fragrance reaction"); Smith Aff. (ECF No. 95-22), PageID # 3299 (noting belief that Kendrick posed no risk to patient); Wadman Dep., PageID # 1201–02 (acknowledging increased risk posed by Kendrick's reactions during handoff).)

---

[21] Notably, Defendants do not dispute that Plaintiff has the necessary training and experience to be a NICU nurse.  <u>See</u> Def. Mot., PageID # 2349 ("There is no dispute that Kendrick, all things being equal, was qualified to be a NICU nurse.").

Defendants maintain that none of these factual disputes are material because it is undisputed "when Kendrick experienced a reaction, she was incapable of performing any of the essential functions of her job." (Def. Mot., PageID # 2331.)  Notably, the record documents no more than fifteen reactions that Kendrick experienced while working in the NICU over a two year period.[22]  In any event, this argument fundamentally ignores that the "qualified individual" prong of a plaintiff's prima facie case explicitly allows for a plaintiff to be deemed a qualified individual if she can establish that she could perform the essential functions of her job *with* reasonable accommodation.  Here, the record would allow a factfinder to readily conclude that Plaintiff performed and was capable of performing all of the essential duties of a NICU Clinical Nurse II so long as she was provided a fragrance-free environment, the accommodation she repeatedly requested and that her treating provider indicated was necessary.  While there is a genuine question as to whether this accommodation was feasible (an issue addressed further below), the Court concludes that the record viewed in the light most favorable to Kendrick contains trialworthy evidence that she was a qualified individual for both her NICU position, as well as for at least some of the positions affected by the December 2018 pause.

In short, on the record presented, Plaintiff has established a prima facie case of disability discrimination.

## 2. Prima Facie Case of Failure to Accommodate

To survive summary judgment on a failure to accommodate theory of disability discrimination, a plaintiff must produce sufficient evidence for a reasonable juror to find that: "(1)

---

[22] As Plaintiff asserts in her motion papers "she remained in the confines of MaineHealth's attendance policy" despite the occasions she was required to stop working due to her reactions.  Pl. Response, PageID # 3119.  Likewise, Defendants acknowledge that during the two-year period in question, Plaintiff actually went one full year without any reported at work fragrance reactions.  See Def. Reply (ECF No. 100-18), PageID # 3566 ("For a year from August 2016 to September 2017, Kendrick did not report any fragrance reactions."); Stip. SMF, PageID # 2366.

[she] is disabled within the meaning of the ADA, (2) [she] was able to perform the essential functions of the job with or without a reasonable accommodation, and (3) [plaintiff's employer], despite knowing of [her] disability, did not reasonably accommodate it."   Ortiz-Martínez v. Fresenius Health Partners, PR, LLC, 853 F.3d 599, 604 (1st Cir. 2017) (quoting Rocafort v. IBM Corp., 334 F.3d 115, 119 (1st Cir. 2003)).   As the Court has already explained, Plaintiff has put forward evidence that would allow a reasonable factfinder to conclude that she was both disabled and capable of performing the essential functions of her NICU position with accommodation.

However, Defendants argue that the record does not establish a prima facie case as to the third element of this failure to accommodate theory because Plaintiff's request for a fragrance-free environment was unrealistic and unreasonable as a matter of law.  (Def. Mot., PageID #s 2340–46.)  They assert that any accommodation of Plaintiff's reactions that involved enforcement of a fragrance-free policy against visitors would have been "unduly onerous, impractical, and unreasonable."  (Def. Mot., PageID #s 2343.)  More specifically, Defendants cite the impact on "totally overwhelmed" families, who are also integral parts of the neonates' care, as well as the ineffectiveness and unseemliness of "smelling people," particularly when "what smell would trigger Kendrick" lacked clear definition.  (Id., PageID #s 2343–46.)

"A reasonable accommodation is a change in workplace conditions that would enable an employee to perform the essential functions of her job."  Trahan v. Wayfair Maine, LLC, 957 F.3d 54, 65 (1st Cir. 2020).  "The ADA compels an employer to make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on [its] operation of the business."  Flaherty, 946 F.3d at 55 (cleaned

up).  "The reasonableness of any proposed accommodation, including its feasibility, must be assessed on a case-by-case basis" and is fact-specific.  Trahan, 957 F.3d at 65.

Here, the record establishes a trialworthy issue as to the reasonableness of the requested fragrance-free accommodation.  Plaintiff has proffered evidence that MaineHealth aimed for a fragrance-free environment under existing policies and communicated to families that the fragrance-free environment in the NICU was necessary to protect "fragile patients as well as staff." (Kingsbury Dep. Ex. 5 (ECF No. 80-3), PageID # 2009.)  Similarly, she points to evidence that, at the time she was removed from her NICU position, her fragrance reactions were actually becoming less disruptive with the help of medication and experience.  (See Pl. Response (ECF No. 94), PageID # 3120; Def. Reply SMF, PageID # 3362; Kendrick Aff. (ECF No. 95-21), PageID # 3291; Kendrick Dep. (ECF No. 73-3), PageID # 760.)  There is also evidence from which a factfinder might conclude that Defendants unreasonably delayed in posting signs to assist in enforcing the fragrance-free policy.  (See Def. Reply SMF, PageID #s 3407–08 & 3330–31; Brady Dep. Ex. 21 (ECF No. 73-5), PageID # 1041 (suggesting sign development took more than a year).)

Quite simply, the issue of the feasibility and reasonableness of the requested accommodation does not lend itself to summary judgment on the record presented.  In the Court's view, a reasonable factfinder could conclude that Defendants' efforts to implement the fragrance-free accommodation were marred by a combination of delay and impatience.  On the other side, the Court acknowledges that a factfinder allowed to weigh the credibility of the various witnesses on this topic might conclude that Defendants made a sufficient good faith effort to implement a reasonable accommodation while balancing the needs of NICU patients and staff.  See, e.g., Trahan, 957 F.3d at 67 (explaining that the interactive process contemplates "good faith efforts" to implement a reasonable accommodation).

In short, the Court concludes that Plaintiff's requested accommodation was not unreasonable as a matter of law and that Plaintiff has presented a prime facie case on her failure to accommodate claims.

### 3. Prima Facie Case of Retaliation

"To make out a prima facie retaliation claim, the plaintiff must show that: (1) she engaged in protected conduct; (2) she experienced an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse employment action." López-López v. Robinson Sch., 958 F.3d 96, 108 (1st Cir. 2020) (internal quotation marks omitted) (quoting Kelley v. Corr. Med. Servs., Inc., 707 F.3d 108, 115 (1st Cir. 2013)). "Not all retaliatory actions, however, suffice to meet the ADA's anti-retaliation provision. Rather, 'a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Sepúlveda-Vargas, 888 F.3d at 555 (quoting Carmona-Rivera v. Puerto Rico, 464 F.3d 14, 20 (1st Cir. 2006)).

Defendants assert that "Kendrick has adduced no evidence of retaliation." (Defs. Mot., PageID # 2330.) Specifically, their Motion initially focuses on the third element of Plaintiff's prima facie case, claiming that "she cannot show that her reassignment was causally connected to any alleged protected conduct." (Id., PageID # 2352.) However, as clarified in her response to Defendants' Motion, Plaintiff points not to her March 2018 reassignment to MMP, but rather to the December 2018 "pause" on her other internal applications as the adverse retaliatory action. (See Pl. Response, PageID # 3139.) In Plaintiff's view, this "pause" was instituted in retaliation for her requesting an accommodation and engaging in the interactive process. And, the result was that she was "trapped" in her reassigned position at MMP, where she was being paid less than she

27

had earned in her NICU position or might have earned in some other position.[23]   (Id., PageID # 3140.)   In the Court's assessment, this record supports a prima facie case on this theory of retaliation.   The record reflects that on December 27, 2018, Kendrick emailed Hodge, who was actively involved in the interactive process related to Kendrick's request for reasonable accommodations, asking why her applications for alternative positions were not being considered. The December 27, 2018 email in itself could perhaps be understood by the factfinder as protected interactive activity and, given the temporal proximity with Hodge's pause request, a causal connection can be inferred.   See, e.g., Cherkaoui v. City of Quincy, 877 F.3d 14, 28–29 (1st Cir. 2017).   This is sufficient to create a trialworthy claim of retaliation.

Having found that Plaintiff has presented a prima facie case on her claims for discrimination, failure to accommodate, and retaliation, the Court notes that Defendants have proffered that all of their actions involving Kendrick were legitimately motivated by concerns for her safety and the needs of MMC patients.   (See Def. Mot., PageID #s 2353–57.)   Thus, the Court turns to the final step of McDonnell Douglas: pretext.

### 4.  Pretext

Defendants contend that, even if Plaintiff can establish her prima facie case, she cannot establish that their reasons for her transfer or the pause were pretextual.   They cite Brader v. Biogen Inc., for the proposition that courts "may not sit as super personnel departments, assessing the

---

[23] The Court acknowledges that Plaintiff proffers an alternative theory of retaliation under which her protected conduct was the filing of a complaint with MHRC and EEOC.  Under this theory, Plaintiff cites the temporal proximity of her November 2018 receipt of a right-to-sue letter and the December 2018 pause.  See Pl. Response, PageID #s 3140–41. However, on the record presented, Plaintiff has not shown that Hodge, who was responsible for the "pause." had any knowledge of the issuance of a right-to-sue letter.  See Pomales v. Celulares Telefonica, Inc., 447 F.3d 79, 85 (1st Cir. 2006) ("Temporal proximity can create an inference of causation in the proper case. . . . But to draw such an inference, there must be proof that the decisionmaker knew of the plaintiff's protected conduct when he or she decided to take the adverse employment action.") (citations omitted).  If this were Plaintiff's sole theory of retaliation, the Court would likely find it cannot survive summary judgment on the record presented.  However, the Court ultimately concludes Plaintiff presents a trialworthy retaliation claim on her alternative theory of the temporal proximity between the interactive process and the pause, as discussed above.

merits -- or even the rationality -- of employers' nondiscriminatory business decisions." 983 F.3d 39, 56–57 (1st Cir. 2020). However, this case is readily distinguishable from the "reduction-in-force" reasoning presented by the employer in Brader. See id. at 55–56. Here, Defendants essentially acknowledge that Kendrick's disability was the reason for her move out of the NICU and that the related interactive process was the reason for the "pause" on her other applications. Thus, the issue of genuine dispute is whether Defendants were motivated by discriminatory animus and unjustified fear, or alternatively, whether Defendants were motivated by legitimate concerns regarding safety and Kendrick's ability to perform essential functions of the positions in question.

As this Court has previously explained, "[t]he pretext inquiry is heavily fact-specific, and, once a court reaches it, that court must be particularly cautious about granting the employer's motion for summary judgment." See Cyr v. Hannaford Bros. Co. LLC, No. 2:17-cv-00321-GZS, 2019 U.S. Dist. LEXIS 39197, at *22 (D. Me. Mar. 12, 2019) (cleaned up). This caution is perhaps particularly warranted in the disability context where an employer genuinely frames an employee's disability as a safety issue, while the employee proffers that she can do the job without creating a safety issue for herself or others. In Brader, the First Circuit reiterated that "[p]retext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." 983 F.3d at 56 (cleaned up). Here, a factfinder weighing the evidence surrounding Defendants' unconventional hiring "pause" might believe that it was motivated by a desire to further the interactive process, or might conclude that explanation is implausible. See, e.g., Brennan v. GTE Gov't Sys. Corp., 150 F.3d 21, 29 (1st Cir. 1998) ("Deviation from established policy or practice may be evidence of pretext.") Likewise, there is an inherent

29

contradiction in Defendants' claim that they removed Kendrick from the NICU because they could not ensure perfect compliance with the fragrance-free policy, when they were also apparently unable to ensure a complete fragrance-free work environment at MMP. In short, the Court concludes the issue of pretext is triable on the record presented.

### 5. Punitive Damages

Defendants also challenge whether Plaintiff's demand for punitive damages should go to the jury. (See Def. Mot., PageID #s 2358–59.) Plaintiff would be "entitled to punitive damages if [s]he can show [Defendants] 'engaged in a discriminatory practice . . . with malice or with reckless indifference to [her] . . . rights.'" Burnett v. Ocean Props., Ltd., 987 F.3d 57, 69 (1st Cir. 2021) (citing 42 U.S.C. § 1981a(b)(1); 5 M.R.S.A. § 4613(2)(B)(8)(c)). "[M]alice and reckless indifference concern, not the employer's awareness that it is discriminating, but the employer's knowledge that it is acting in violation of federal law." Id. (quoting McDonough v. City of Quincy, 452 F.3d 8, 24 (1st Cir. 2006)). Plaintiff "must prove [her] entitlement to punitive damages by a preponderance of the evidence under the ADA, and by the higher clear-and-convincing-evidence standard under the MHRA." Id. (internal citations omitted).

Defendants argue that Plaintiff "has not elicited any evidence of intentional discrimination or retaliation, much less malicious discrimination, or reckless disregard to her rights." (Def. Mot., PageID # 2358.) They point to their policies forbidding discrimination, relevant training they provide employees, and their engagement in an extended interactive process with Plaintiff. (Id., PageID # 2359.) For her part, Plaintiff asserts that these same factors show that Defendants would have been aware they were violating the law, particularly in the context of the "pause" on Kendrick's applications for other positions. (Pl. Response, PageID #s 3142–43.)

Based on this record, the Court cannot conclude that there are no facts from which a reasonable jury could determine that Defendants acted with malice or reckless indifference.

Rather, this issue can only be resolved by a factfinder who is able to make the necessary credibility determinations regarding what motivated the decisionmakers who transferred Kendrick and instituted the pause on her applications for alternative positions. To be clear, on the record presented, it is equally plausible that a reasonable factfinder might conclude that Defendants made a good faith effort to prevent discrimination. Therefore, the Court DENIES summary judgment on Plaintiff's request for punitive damages.[24]

### C. Remaining Issues Raised by Plaintiff's Partial Motion for Summary Judgment

Having determined that Defendants are not entitled to summary judgment on any of Plaintiff's claims, the Court is left to consider Plaintiff's request for summary judgment on two MHRA-focused issues, both relating to Defendants' pause on her applications for alternative positions.

#### 1. Failure to Hire & the Futile Gesture Doctrine

Plaintiff asserts that the pause constituted an impermissible "blanket ban" under the MHRA that resulted in Defendants failing to hire her for some positions she applied for. (See Pl. Mot., PageID #s 2258–61.) Additionally, Plaintiff maintains that the "ban" rendered any potential application she would have made to positions after she learned about the pause a "futile gesture." (Id., PageID #s 2259.) She requests that the Court therefore determine as a matter of law "that Defendants violated the MHRA when they instituted the 'pause.'" (Id., PageID # 2264.)

As it relates to her actual submitted applications that were affected by the pause, the Court concludes Plaintiff's claims under the MHRA are trialworthy for reasons already discussed. But,

---

[24] Although Defendants' request for summary judgment on punitive damages does not distinguish between Plaintiff's various claims, the Court notes that, as a matter of law, Plaintiff may not seek punitive damages on her Rehabilitation Act claims (Counts VII-IX). See Barnes v. Gorman, 536 U.S. 181, 189–90 (2002) (punitive damages unavailable under the Rehabilitation Act). Likewise, Plaintiff's ability to seek punitive or compensatory damages on her ADA retaliation claim (Count VI) is questionable, at best. See, e.g., Kramer v. Banc of Am. Sec., LLC, 355 F.3d 961, 965 (7th Cir. 2004) (holding "compensatory and punitive damages are not available" on an ADA retaliation claim), cert. denied, 542 U.S. 932 (2004).

the record, which contains multiple genuine disputes related to the pause, does not establish that Plaintiff is entitled to summary judgment on these claims.

The Court reaches a similar conclusion with respect to Kendrick's claims that she was subject to discrimination under the MHRA for positions that she did not actually apply for.  Under the futile gesture doctrine, "[w]hen a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application."  Russell v. ExpressJet Airlines, Inc., 32 A.3d 1030, 1034–35 (Me. 2011) (quoting Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 365–66 (1977)).   As relevant here, the Court finds Plaintiff's foundational assertion—that she would have applied for additional positions with Defendants after her 2019 retirement but for the pause—involves a trialworthy credibility determination.  Therefore, the Court concludes Plaintiff is not entitled to summary judgment on this issue.

### 2.   The MHRA Safety Defense

Plaintiff also asks the Court to rule that "Defendants cannot justify the 'pause' based on the MHRA safety defense."  (Pl. Mot, PageID # 2264.)   While a MHRA claim for disability discrimination generally rises or falls with its analogous federal ADA claim, the MHRA has traditionally placed the burden on the employer to establish "that it had a factual basis to believe that, to a reasonable probability, the employee's physical handicap renders him unable to perform his duties or to perform such duties in a manner which will not endanger his own health or safety or the health or safety of others."  Warren v. UPS, 518 F.3d 93, 98 (1st Cir. 2008) (quoting Maine Hum. Rts. Comm'n v. Canadian Pac., Ltd., 458 A.2d 1225, 1234 (Me. 1983)); see also 5 M.R.S.A.

§ 4573-A(1-B) (2013). [25]   In other words, the issue of safety (of the employee and others) is treated as part of an affirmative "safety defense" under the MHRA.  In contrast, under the ADA, at least where the employee's "essential job functions necessarily implicate the safety of others," the issue is treated as part of the employee's prima facie showing of qualification.  EEOC v. Amego, Inc., 110 F.3d 135, 144 (1st Cir. 1997).

However, Defendants have stated that they do not rely on the safety defense in regard to the pause, instead reasserting that Plaintiff was "not qualified for these positions because she need[ed] to be in a fragrance-free environment."  (Def. Response, PageID #s 2731–32.)  Because Defendants do not purport to assert this defense as to the pause,[26] the Court concludes that it need not address Plaintiff's argument that Defendants cannot establish a safety defense as to this particular adverse action.  Rather, in light of Defendants' response, the Court deems this defense as abandoned and waived.  See, e.g., City of Winston Salem v. Nw. Child Dev. Ctr., Inc. (In re Nw. Child Dev. Ctr., Inc.), No. 20-50632, 2021 Bankr. LEXIS 1693, at *38–39 (Bankr. M.D.N.C. June 24, 2021) ("Where a party pleads an affirmative defense in the answer, but fails to contest a summary judgment motion on those grounds, the Court may deem those defenses abandoned.") (cleaned up).

---

[25] As of September 19, 2019, the Maine Legislature repealed the safety defense provision contained in 5 M.R.S.A. § 4573-A(1-B).  See 2019 Me. Laws 1201, ch. 464 (titled "An Act To Clarify Various Provisions of the Maine Human Rights Act").  This repeal was apparently a legislative error.  See Pl. Response, PageID # 3135 n.11 & Def. Reply, PageID # 3571 n.4.  However, Maine has now enacted corrective legislation that will, once it becomes effective, reintroduce this deleted provision.  See 2021 Me. Laws ---, ch. 366 (titled "An Act To Improve Consistency in Terminology and within the Maine Human Rights Act").

[26] The Court notes that Defendants' Answer asserted as an "affirmative defense" that "Plaintiff posed and poses a direct threat to the safety of herself and others."  Answer (ECF No. 11), PageID # 62.  While the Court views this defense as abandoned for purposes of the pause, the issue of whether the defense, as revived under the recent amendment of 5 M.R.S.A. § 4573-A(1-B), may still be asserted as to the NICU transfer cannot and is not resolved by this Order.

## IV.    CONCLUSION

For the reasons just given, the Court DENIES both Defendants' Motion for Summary Judgment (ECF No. 79) and Plaintiff's Motion for Partial Summary Judgment (ECF No. 83).

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 30th day of June, 2021.